UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES D. WILLIAMS | CIVIL ACTION |
| v. | NO. 16-2236 |
| GREAT AMERICAN INSURANCE COMPANY, ET AL. | SECTION "F" |

ORDER AND REASONS

Before the Court are two motions: (1) MCT Transportation, LLC's motion for summary judgment; and (2) Great American Insurance Company's motion for summary judgment. For the reasons that follow, MCT Transportation, LLC's motion is DENIED and Great American Insurance Company's motion is GRANTED.

**Background**

This personal injury litigation and insurance coverage dispute arises from the plaintiff crashing his sport utility vehicle into a bobtail[1] tractor, which was parked on Pearl Parkway in St. Tammany Parish while the tractor's driver was asleep inside the sleeping berth of the tractor.

On June 7, 2015, Kent Risner drove a 2006 Kentworth tractor trailer -- which he owned and operated but leased to MCT

---

[1] See SAUL SORKIN, GOODS IN TRANSIT § 45.01 (2008)(defining "bobtailing" as "[t]he operation of a tractor without an attached trailer").

1

Transportation, LLC (MCT) -- to AWG Grocers in Pearl River, Louisiana so that he could deliver goods that he had been hauling from Kansas City, Missouri.[2] He delivered the trailer of goods to the AWG facility between 11:00 and 11:30 p.m. The trailer was not unloaded at that time. Instead, leaving the trailer of goods behind at the AWG facility to be unloaded, Risner left the facility in the tractor and parked nearby to sleep.[3] Shortly thereafter, at about 1:30 a.m. on June 8, James Williams was driving a 1998 Mercury Mountaineer eastbound on Pearl Parkway when he struck Risner's Kentworth tractor, which Williams alleges was illegally parked, without parking lights, in the eastbound lane.[4] Williams failed to see the tractor and alleges that he was injured as a result of the collision.

Prior to dropping off the trailer of goods on June 7, 2015, Risner had received dispatch instructions from MCT, directing him to pick up a load in Kansas City, Missouri and deliver it to the AWG facility in Pearl River, Louisiana. He received a bill of lading from MCT containing these instructions. Risner confirmed

---

[2] When he was not hauling for MCT, Risner regularly garaged the 2006 Kenworth tractor at his house in Myrtle, Missouri.
[3] While waiting for the trailer to be emptied, Risner left the facility and parked nearby in order to rest pursuant to the 10-hour break rule imposed by 49 C.F.R. § 395.3 of the Federal Motor Carrier Safety Act.
[4] This is disputed. Mr. Risner has stated that he was asleep inside the cab of the tractor trailer, which he said he had parked on the roadway shoulder outside the AWG warehouse gates.

2

that the delivery made just prior to the accident was made for MCT pursuant to the dispatch instructions contained in the bill of lading.  When Risner arrived at the AWG facility before midnight on June 7 to drop off the trailer for unloading the next morning, the bill of lading accompanying the load was stamped "Received-Subject to Count," with the understanding that the trailer would be unloaded and the cargo would be counted the next morning.[5] Risner planned to return to pick up the empty trailer on June 8 after it was unloaded.  Then, consistent with MCT policy, he planned to take the empty trailer to MCT's facility in Gulfport, Mississippi so that he could pick up another load for MCT and deliver it to a receiver on his return trip north.[6]

The MCT-Risner lease agreement for the tractor trailer provided that, pursuant to federal regulations, "MCT will have exclusive possession, use and control of the equipment, and that MCT will assume complete responsibility for the operation of the equipment, required by such regulation during the term of this Agreement."  In transporting commodities for MCT, the lease

---

[5] Nevertheless, Risner testified, that at that point, "I could take that bill of lading and [send] it to MCT and get it on my next paycheck.  That load was considered delivered to me."
[6] Risner did not have to wait on this particular trailer to be unloaded, but he told Curtis Snyder with MCT that he would wait on this trailer to be unloaded and take it to Gulfport.  Risner testified that he was waiting on this particular trailer to be unloaded so he could haul it to Gulfport so that it could be loaded for his return trip.

3

agreement obliged Risner to do so in "an efficient and prompt manner in accordance with instructions given by MCT and in accordance with all applicable federal, state, and local laws and regulations." The lease agreement stated that MCT would "dispatch" Risner as to pertinent matters regarding the receipt, transportation, and delivery of commodities to be transported by the equipment. In accordance with the lease agreement, Risner was to receive 72% of the gross revenue for each load delivered on behalf of MCT. The lease required Risner to "deliver to MCT all shipping documents, including but not limited to bills of lading...which evidence receipt of the commodities transported." The delivery instructions would be documented in a bill of lading that Risner received for each load from or on behalf of MCT. Once the bill of lading was signed by the recipient evidencing delivery, Risner would turn the signed bill of lading into MCT in order to get paid.

According to MCT policy, a driver that delivered a load to the AWG facility in Pearl River must wait for any empty trailer (if available) and take it to the MCT facility in Gulfport to pick up a load of Dole bananas to transport north on the return trip.[7]

---

[7] Risner testified: "We [MCT drivers] were asked to always pull an empty trailer back from Gulfport or back from Pearl River to Gulfport. And if we didn't or if there was not an empty, we needed to call – I needed to call Mr. Snyder and get his blessing to come over there bobtail without a trailer."

4

This policy ensured that each driver was carrying a revenue producing load on the trip to and from Pearl River and Gulfport. Both Risner and MCT were paid for the delivery of the load to AWG and for making another delivery by picking up a load from MCT's facility in Gulfport.

Risner was required to acquire non-trucking liability insurance. Great American Insurance Company issued to Risner a Non-Trucking Liability and Physical Damage Policy beginning on October 1, 2014. The Policy provides neither general liability insurance coverage, nor does it provide commercial automobile liability coverage. Rather, non-trucking policies are designed to provide bobtail insurance coverage, for tractors while they are not being used for business purposes. Part II – LIABILITY COVERAGE FOR NON TRUCKING USE provides:

> A.   COVERAGE
>
> We will pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.
>
> ***
>
> 2.   HOWEVER, NONE OF THE FOLLOWING IS AN INSURED:
>
>>    a.   Anyone engaged in the business of transporting property for hire.
>
> ***
>
> C.   EXCLUSIONS
>
> This insurance does not apply to any of the following:

```
***
```

13. TRUCKING OR BUSINESS USE

Bodily injury or property damage arising out of any accident which occurs while the covered auto is being used in the business of any lessee or while the covered auto is being used to transport cargo of any type. For purposes of this exclusion the phrase "in the business of any lessee" means any of the following uses of the covered auto:

 a. for the benefit of or to further the interest of any lessee or when conducting business of any type;

 b. by any person or organization acting within the scope of employment of any lessee;

 c. by any person or organization acting under the direction, control or dispatch of any lessee;

 d. while traveling to or from any location for the purpose of picking up, delivering or transporting cargo on behalf of any lessee;

 e. while traveling between any location where the covered auto is regularly garaged and

  i. any terminal or facility of any lessee, or

  ii. any other location,

   for the purpose of picking up, delivering or transporting any cargo; or

 f. while traveling from:

  (1) any terminal or facility of any lessee, or

  (2) any location at which the covered auto was present for the purpose of picking up, delivering or transporting cargo, to any location where the covered auto is regularly garaged.

On March 15, 2016, invoking this Court's diversity jurisdiction, Williams sued Risner, Jose Chavez, MCT, and three

insurance companies, Travelers Casualty & Surety Company of America, RWI Transportation, LLC, and Great American Insurance Company (GAIC). On August 11, 2016, the Court granted the plaintiff's motion to dismiss without prejudice his claims against RWI, Travelers, and Chavez. MCT and GAIC now seek summary judgment on the issue of whether GAIC's policy provides coverage.

I.

A.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish

7

an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

*B.*

According to Louisiana law,[8] an insurance policy is a contract that must be construed using the general rules of contract interpretation set forth in the Civil Code. See Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003). The Court's role in interpreting contracts is to determine the common intent of the parties. La. Civ. Code art. 2045. In determining common intent, pursuant to Civil Code article 2047, words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. See Henry v. South Louisiana Sugars Co-op., Inc., 957 So.2d 1275, 1277 (La. 2007)(citing Cadwallader, 848 So.2d at 580). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent" (La. Civ. Code art. 2046), and the agreement must be enforced as written. Hebert v. Webre, 982 So.2d 770, 773-74 (La. 2008). The Court's approach to a contract's meaning is driven by simple common sense principles.

Courts should not interpret insurance policies in an unreasonable or a strained manner so as to enlarge or to restrict policy provisions beyond what is reasonably contemplated by the

---

[8] There is no dispute that Louisiana law governs this diversity case.

terms or so as to achieve an absurd conclusion. South Louisiana Sugars Cooperative, 957 So.2d at 1277 (citation omitted). Unless it conflicts with state law or public policy, an insurance policy may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes. Id. at 1277-78 (citations omitted).

A policy provision that is susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. Civ. Code art. 2049. Further, the policy should be construed as a whole and one portion should not be construed separately at the expense of disregarding another. See La. Civ. Code art. 2050; see also Hebert, 982 So.2d at 774 (citations omitted).

If an ambiguity remains after the Court applies the general rules of construction, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Henry, 957 So.2d at 1278 (citing Cadwallader, 848 So.2d at 580). Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Id. (citing Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 630 So.2d 759, 764 (La. 1994) and Garcia v. St. Bernard Parish School Board, 576 So.2d 975, 976 (La. 1991)). For the rule of strict construction to apply, the ambiguous

10

insurance policy provision must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.  Id. (citing Cadwallader, 848 So.2d at 580).

II.

A.

As a threshold matter, it is undisputed that: Risner was the insured under the GAIC policy; Risner owned the 2006 Kenworth tractor, which was the "covered auto" for the purposes of the policy; and the tractor was leased to MCT at the time of the accident.  It is likewise undisputed that the exclusionary language contained in the policy is unambiguous.  The only dispute is whether the facts as established by the summary judgment record trigger the unambiguous business use exclusion contained in GAIC's non-trucking liability policy.

B.

MCT submits that these facts demonstrate that Risner was not using the covered auto in the business of MCT at the time of the accident such that the GAIC policy provides coverage:  Risner had dropped off the trailer with the load he was carrying for MCT, went to the guard facility and checked out; Risner was not headed to MCT at the time of the accident; Risner was not pulling a trailer or transporting any cargo at the time of the accident; Risner had what he needed (the bill of lading) to get paid for the

11

load if he would have left right after delivery; MCT did not direct him to park on the Pearl Parkway, nor did MCT direct him to sleep in his cab; Risner was asleep at the time of the accident; Risner was not required to bring the particular trailer he transported to AWG back to Gulfport.

GAIC counters that: MCT is not an insured nor a third party beneficiary and, therefore, has no standing to claim coverage under GAIC's policy; there is no coverage under the business use exclusion in the non-trucking liability policy because it is undisputed that Risner was in the business of trucking for MCT at the time of the accident. The summary judgment record and an analogous Fifth Circuit case support GAIC's motion.

GAIC submits that the record supports its position that the vehicle was being used in the business of MCT when the accident happened. The Court agrees that the record facts trigger GAIC's business use policy exclusion, which states:

> Part II – LIABILITY COVERAGE FOR NON TRUCKING USE provides:
>
> A.   COVERAGE
>
> We will pay all sums an insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered auto.
>
> ***

12

2. HOWEVER, NONE OF THE FOLLOWING IS AN INSURED:

    a. Anyone engaged in the business of transporting property for hire.

\*\*\*

C. EXCLUSIONS

This insurance does not apply to any of the following:

\*\*\*

13. TRUCKING OR BUSINESS USE

Bodily injury or property damage arising out of any accident which occurs while the covered auto is being used in the business of any lessee or while the covered auto is being used to transport cargo of any type. For purposes of this exclusion the phrase "in the business of any lessee" means any of the following uses of the covered auto:

    a. for the benefit of or to further the interest of any lessee or when conducting business of any type;

    b. by any person or organization acting within the scope of employment of any lessee;

    c. by any person or organization acting under the direction, control or dispatch of any lessee;

    d. while traveling to or from any location for the purpose of picking up, delivering or transporting cargo on behalf of any lessee;

    e. while traveling between any location where the covered auto is regularly garaged and

        i. any terminal or facility of any lessee, or

        ii. any other location,

        for the purpose of picking up, delivering or transporting any cargo; or

    f. while traveling from:

        (1) any terminal or facility of any lessee, or

        (2) any location at which the covered auto was present for the purpose of picking

> up, delivering or transporting cargo, to any location where the covered auto is regularly garaged.

GAIC submits that the facts of this case trigger both section 13(c) and 13(d) of the business use exclusion. Section 13(c) offers one definition of "in the business of any lessee" means the use of a covered auto by any person acting under the direction, control, or dispatch of any lessee. And, section 13(d) offers another: "in the business of any lessee" means the use of a covered auto by any person while traveling to or from any location for the purpose of picking up, delivering or transporting cargo on behalf of any lessee. Here, the summary judgment record demonstrates that Risner had dropped off the trailer of goods, drove just outside the warehouse gates and parked the tractor and retired to sleep in the cabin of the tractor for his mandatory break, all while he waited to pick up the emptied trailer the next day so that he could haul it to MCT's facility in Mississippi, where he would pick up a load of bananas to haul north. Although MCT did not direct that he sleep in his truck on the shoulder of the highway, MCT does not dispute its own company policy as Risner described it: if a trailer is available for transport from AWG, a driver must transport the trailer to its facility in Gulfport to pick up another load for transport. These facts demonstrate that Risner's tractor was being

14

used in the business of MCT at the time that Williams crashed into it.  GAIC is entitled to judgment as a matter of law.

Simply put, the evidence in the summary judgment record supports Risner's testimony that he was not heading home or otherwise off the clock at the time of the accident, but, rather, he was waiting in Pearl River to retrieve the trailer he had delivered there, once it was unloaded, after which and pursuant to MCT company policy, he was to pick up another load for MCT in Gulfport.  MCT downplays its company policy as described by Risner by focusing on Risner's testimony that he "volunteered" to wait for the emptied trailer and MCT underscores the fact that Risner was sleeping after midnight at the time of the accident.  But the fact that Risner "volunteered" to take the emptied trailer in the morning as opposed to arranging to take some other trailer or call MCT to get further instruction if he was going to violate company policy by not transporting an available empty trailer to its facility is not material.  There is no dispute in the record that MCT had in place a policy of requiring drivers to haul an empty trailer, if available, from AWG to its facility in Gulfport.  Nor is there any dispute that Risner was acting in accordance with MCT policy by staying over and, coincidentally, taking his federally-mandated break while waiting for the available trailer to haul the next day.

Nor does the fact that Risner was sleeping at the time of the accident transform Risner's status from being in the business of MCT to being off the clock. In fact, the summary judgment record shows that Risner's rest break was mandated by federal regulations. Risner testified that he was required to take a 10 hour break in his sleeper berth whenever he had been driving 11 hours (inclusive of a mandatory 30 minute break that had to be taken within the first 8 hours).[9] It is undisputed that Risner did not have a choice in taking this break and it was during this break that the accident occurred.

The Court's conclusion that, as a matter of law, the covered auto was being used in the business of MCT at the time of the accident is reinforced by Mahaffey v. General Sec. Ins. Co., 543 F.3d 738 (5th Cir. 2008). There, the district court ruled that an insurance policy provided coverage for a commercial truck accident, holding that a "non-trucking use" endorsement in the policy did not exclude coverage because the driver was not "in the business of" the trucking-company lessee at the time of the accident. But the Fifth Circuit reversed and rendered, finding that the driver was in the business of the lessee as a matter of

---

[9] Risner's driver logs for June 7 and June 8 indicate that, at all times leading up to and including the time of the accident, he was "on duty" for MCT.

law. The facts of Mahaffey as summarized by the per curiam panel are pertinent here:

> Farr Auto Sales (Farr) leased a truck and provided a driver, Arthur Wynn, to First Coast Intermodal Service to haul a load from Bowling Green, Kentucky, to New Orleans, Louisiana. Wynn dropped the load off in New Orleans at approximately 4 p.m. and called the First Coast dispatcher. The dispatcher told Wynn to "take the rest of the night off and call [First Coast dispatch] in the morning to see if they had a load." After speaking with the First Coast dispatcher, Wynn drove the truck without its trailer ("bobtailed")[10] to a truck stop where he ate dinner, watched television, took a shower, and played some slot machines. In total, Wynn stayed at the truck stop for between six and seven hours.
>
> Although Wynn usually slept in the cab of his truck, a leak left the mattress in the main cabin wet, and Wynn decided to go to a motel for the night. On his way to the motel, Wynn was involved in an automobile accident with John Mahaffey. Mahaffey brought suit in Louisiana state court against Wynn, First Coast, and First Coast's insurance provider, GSI. [Defendants then removed the case to federal court and then filed a third-party complaint against Redland Insurance Company, alleging that because Wynn was bobtailing at the time of the accident, the Redland insurance policy provided primary coverage.]

543 F.3d at 739.

The Redland policy in Mahaffey included a non-trucking endorsement, which provided that "the insurance does not apply to ...[a] covered 'auto' while used to carry property in any business...[or] a covered 'auto' while used in the business of

---

[10] See SAUL SORKIN, GOODS IN TRANSIT § 45.01 (2008)(defining "bobtailing" as "[t]he operation of a tractor without an attached trailer").

17

anyone to whom the 'auto' is rented."[11] Id. at 740. Because the Louisiana Supreme Court had not considered whether an independent trucker is acting in the business of a lessee, the Fifth Circuit ascertained how the state supreme court would rule if faced with interpreting such an insurance provision. Id. at 741. The Fifth Circuit considered instructive certain non-exclusive factors articulated by the only state appellate court to consider a similar issue: whether the driver was free to go where he pleased; whether the driver was paid for time or mileage; whether the driver was under dispatch or standby for further deliveries; and whether the activity was more of a personal or work-related function. Id. at 742 (citing LeBlanc v. Bailey, 700 So.2d 1311 (La.App. 4 Cir. 1997)).

In concluding that Wynn was acting in the business of First Coast, the Fifth Circuit found it significant that Wynn was not heading home; rather, he was on standby for further deliveries and had not been released to return to his home in Missouri. Id. The Fifth Circuit also reasoned that Wynn was furthering First Coast's commercial interests to have a driver on standby and that, unlike driving home after completing deliveries,

---

[11] Like in Mahaffey, the phrase "in the business of" in GAIC's non-trucking policy exclusion is unambiguous, and the issue of properly resolved as a matter of law on a motion for summary judgment. See id. at 741.

> driving to a motel far from home in order to sleep to be adequately rested, when asked to remain in the area to see if a load becomes available, is a work-related function for a commercial driver because commercial drivers are required to have a certain number of rest hours between hauls.

Id. at 743. "Unlike driving home, which is generally found to be not in the business of a lessee," the Fifth Circuit observed, "Wynn was driving to a motel to sleep with a reasonable expectation that a load would be available the following day. Courts have recognized that a driver can be acting in the business of another when driving to or from a place to sleep or rest." Id.; cf. Auto-Owners Ins. Co. v. Redland Ins. Co., 549 F.3d 1043 (6th Cir. 2008)(truck was being used "in the business of" trucking company when driver was involved in an accident while driving to find a place to sleep for the night and traveling in the direction of his next presumed, though not confirmed, dispatch).

Like Wynn, Risner was bobtailing after delivering a load for his trucking company lessee at the time of the accident. And, like Wynn, Risner had not been released to travel home to Missouri, but, rather, pursuant to company policy, he was on standby or dispatch to pick up his empty trailer and then retrieve another load. And, finally, Risner was in the process of taking a federally mandated break when the accident occurred. Under the circumstances, when remaining in the area entirely for work-

19

related reasons, to pick up a trailer to then travel to the lessee's facility to retrieve another load to haul, this is indisputably "a work-related function for a commercial driver because commercial drivers are required to have a certain number of rest hours between hauls." See id. at 743. Where, as here, the tractor was being used to further the commercial interests of the lessee, MCT, Risner was acting in the business of MCT as a matter of law.

Accordingly, for the foregoing reasons, GAIC's motion for summary judgment is GRANTED and MCT's motion for summary judgment is DENIED.

New Orleans, Louisiana, March 8, 2017

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE